# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                     Case No.  07-CR-57

THOMAS BALSIGER, et al.,

        Defendants.

## ORDER AFFIRMING IN PART AND REVERSING IN PART MAGISTRATE JUDGE'S DECISION AND ORDER REGARDING PRIVILEGE LOGS

In this prosecution, eleven persons are charged with twenty-seven counts of wire fraud, conspiracy to commit wire fraud, and conspiracy to obstruct justice, related to the coupon business conducted by International Outsourcing Services, LLC ("IOS").  Two groups of defendants asserted attorney-client privilege or work-product privilege regarding more than two thousand documents.  Magistrate Judge Patricia J. Gorence reviewed thousands of pages of documents and issued a Decision and Order on May 11, 2011, in which she discussed applicable attorney-client privilege and work-product law, including issues of common interest doctrine, corporate versus individual representation, and the crime-fraud exception.  On nineteen pages of her decision she listed the documents or portions of documents that she found were not privileged.

The United States appealed Magistrate Judge Gorence's decision as to approximately 325 documents, twelve of which were claimed as privileged by Lance and Steve Furr ("the Furr defendants"); the remainder was claimed as privileged by defendants Thomas Chris Balsiger and James Currey ("the Balsiger-Currey defendants").  The Furr defendants responded as to only five documents and impliedly agreed to disclose the other

seven documents.  In an order of November 8, 2011, this court sustained the objection to Magistrate Judge Gorence's decision as to those seven documents and deemed them not privileged.  In addition, this court directed the defendants to file additional copies of the documents still at issue for in camera consideration and instructed the government to indicate the particular pages and exhibits of prior documents it was incorporating into its appeal.  The appeal is now  ready for decision.

A magistrate judge is authorized to decide nondispositive motions such as those involving attorney-client or work product privilege.  *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Crim. P. 59(a).  A party may object to, i.e., appeal, such decisions.  Fed. R. Crim. P. 59(a); *see* § 636(b)(1)(A).  If an appeal is filed, the district judge may set aside the magistrate judge's decision, or any portion of it, if persuaded that the order was contrary to law or clearly erroneous.  § 636(b)(1)(A); Fed. R. Crim. P. 59(a).  The clear error standard means that the court overturns the magistrate judge's ruling only if it is "left with the definite and firm conviction that a mistake has been made."  *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997).

OBJECTIONS TO OVERALL DECISION AND GROUPS OF DOCUMENTS

Prior to discussing the particulars of each document reviewed in camera,  the court will address the government's general objections to Magistrate Judge Gorence's decision and contentions that apply to multiple documents.

A.    Basis for Finding that Privilege Exists as to Each Document

First, the United States faults Magistrate Judge Gorence for not setting forth the basis for her finding that each unlisted document was privileged.  Magistrate Judge Gorence identified hundreds of documents she found *not* privileged or only partially

2

privileged. She did not discuss the basis for protecting the hundreds of documents she found *were* privileged. But Magistrate Judge Gorence faced and accomplished an enormous task. This court does not fault her for not listing every one of the thousands of documents reviewed and describing the finding as to each.

The government contends that it cannot determine whether Magistrate Judge Gorence properly considered and rejected the government's arguments regarding waiver, common interest membership, crime fraud, or scope of the work-product doctrine. (Doc. 473 at 3.) Magistrate Judge Gorence's discussion of pertinent law was comprehensive. This court is sufficiently persuaded that she considered all of the pertinent arguments and law as to each document she reviewed. That she did not write more about her review does not mean she failed to consider the government's arguments.

Nevertheless, because the documents at issue are now reduced to a (more) manageable number, and this decision is subject to review by the Seventh Circuit, this court will provide the basis for its ruling as to the documents still at issue. *See In re Grand Jury Proceedings*, 220 F.3d 568, 572 (7th Cir. 2000) (remanding to the district court to enter more extensive findings on privilege regarding documents reviewed in camera). The five remaining documents respecting the Furr defendants will be discussed in the body of this decision. Additionally, attached and incorporated into this decision is a spreadsheet indicating the court's conclusion and reasoning regarding the documents of the Balsiger-Curry defendants.

B.    Documents Deemed Privileged and Not Privileged

Second, the government indicates that some of Magistrate Judge Gorence's determinations are inconsistent—a few documents appear to be listed on multiple privilege

3

logs but on one log are ruled privileged and on another log are ruled not privileged. (*See* Doc. 473 at 3.) To the extent that this has occurred, such documents are not privileged. None of the defendants objected to any of the "not privileged" rulings. Thus, those rulings stand and the documents must be disclosed regardless of whether they were found privileged on another log by Magistrate Judge Gorence (or even by this court in this opinion[1]). This applies, for instance, to Log 7 Doc. 3, which was deemed privileged by Magistrate Judge Gorence, but is identical to Log 1 Doc. 37 (*see* Ex. 10 Log SAY Rev 2010).

The defendants could have avoided inconsistent rulings through a different method of presenting the documents at issue to the court, as discussed below.

C.     Members of the Common Interest/Joint Defense Group[2]

Third, the United States contends that Magistrate Judge Gorence

erroneously designated a number of documents as privileged, notwithstanding the fact that the communications were disclosed to individuals outside the common interest group. To the extent that the Magistrate Judge viewed Mr. Clark, Ms. Peak, Mr. Perry or Ms. Flynn as members of the group, her conclusions are clearly erroneous because the only evidence in the record establishes that none of these individuals ever shared a common interest with the defendants.

Alternatively, says the government, if a common interest ever existed, it ended at the latest when these individuals agreed to cooperate with government agents. (Doc. 473 at 8-9.)

---

[1] It is not this court's job to sift through thousands of pages of documents to find such inconsistencies. If the parties require resolution of whether documents on separate logs are identical for purposes of this ruling, they can submit the matter to Magistrate Judge Gorence for comparison of those documents. But the government will get a copy of the "not privileged" document regardless, so such a comparison does not seem necessary.

[2] The "common interest" doctrine and "joint defense" doctrine are two titles for the same thing. For ease of reference the court will use "joint defense" from this point forward.

This court agrees with the government's contention that the defendants have failed to establish any joint defense or common interest agreement, express or implied, with Christine Peak, Kevin Perry, or Debby Flynn. The Balsiger-Currey defendants do not even argue that any of the three were part of a joint defense group. (Doc. 201 at 19-21.) Although Peak is named on the Furr defendants' joint defense list (Doc. 391 Ex. 1 at 3), the record indicates that at the time of the communications at issue, Peak no longer worked at IOS nor had any joint defense or actions in common with the individual defendants.

Flynn and Perry appear to have been employees of IOS at the time of the communications at issue, and the Furr defendants include them on their joint defense list (*see* Doc. 391 Ex. 1 at 2). But the Furr defendants have not shown that they were part of any joint defense group. An employee's cooperation in an internal investigation conducted by the company's attorney is not equivalent to the employee seeking personal representation. *See In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 338-39 (4th Cir. 2005); *United States v. Weissman*, 195 F.3d 96, 99-100 (2d Cir. 1999). The court has not been alerted to evidence indicating that Perry or Flynn was involved in communications as to his defenses or was part of the defense group responding to the government's investigation. Instead, it appears that Perry and Flynn were IOS employees responding to their company's internal inquiries. The burden is on the defendants to demonstrate the existence of a joint defense agreement that precludes disclosure of documents and communications. *Weissman*, 193 F.3d at 99.

According to the government (whose attorneys interviewed them), Peak and Perry were interviewed as cooperating witnesses on October 27, 2005, and mid-February 2006,

5

respectively.  (Doc. 473 at 10.)  Perry had given Peak's and IOS's attorneys information implicating the company and certain individual defendants in October 2005.  (*See, e.g.*, Doc. 215 Ex. V.)  According to the government, Flynn agreed to cooperate on October 6, 2005.  (Doc. 473 at 11.)  Any joint defense certainly would have ended as of those dates.

Clark was an outside consultant and acted as a conduit for information between IOS and its attorneys during the period of the joint defense agreement.  (*See* Doc. 201 at 19 n.5.)  Such an outside consultant may, due to his relationship with the client, possess the information that the company's attorneys need for their representation.  Thus, Clark may have been a "functional employee" for purposes of corporate attorney-client privilege. *United States v. Graf*, 610 F.3d 1148, 1157-59 (9th Cir. 2010).  And employees who confer with corporate attorneys regarding legal matters and legal investigations are generally covered by the corporation's privileges.  *See Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981).  IOS has waived all privileges.  Thus, because any privilege involving communications with Clark was IOS's to waive, any communications by or on behalf of Clark are subject to the company's waiver.

A corollary applies because the company was a part of the joint defense group.  As a limited liability company, IOS could only act through its agents.  Because Clark was part of the team from IOS working with the company's attorneys during the government's investigation, he was part of IOS for joint defense purposes.  Thus, communications by other joint defense defendants that were revealed to Clark (i.e., IOS) as part of the joint defense may be privileged against disclosure.

Magistrate Judge Gorence stated that to the extent that any log entry claimed joint defense privilege but the document included individuals who were not members of the joint

6

defense agreement, the document is not privileged. (Doc. 472 at 22.) In reviewing the individual documents at issue in this appeal, the court will consider whether the magistrate judge erred notwithstanding that determination. Notably, Magistrate Judge Gorence found that any joint defense agreement began at the earliest on September 12, 2005 (Doc. 472 at 22), and no party has appealed that finding.

D.    Application of the Crime-Fraud Exception

Fourth, the United States contends that Magistrate Judge Gorence failed to discuss or properly apply the crime-fraud exception. The government points to the lack of an analysis of the crime-fraud exception "as it applies to the facts of this case," in particular the absence of any discussion of the "store-tag defense" or "the accrual." (*See* Doc. 473 at 27.) The United States argues that "it is impossible to determine whether the Magistrate Judge applied the exception, or declined to apply the exception because the defendants provided a satisfactory, alternative explanation that rebutted the United States' prima facie showing." (*Id.* (emphasis deleted).) Further, says the government, the magistrate judge designated certain documents privileged "when the crime fraud exception clearly applied to those documents." (*Id.*)

This court does not agree failure to discuss the application of the crime-fraud exception to specific documents in this case means that the magistrate judge did not consider the exception properly. Magistrate Judge Gorence discussed the law governing the crime-fraud exception (Doc. 472 at 19-20) and then commented respecting the specific documents "the court has considered the law as previously addressed" (*id.* at 21). This court has no reason to doubt her statement that she considered the crime-fraud exception

7

as to all documents. The volume of documents reviewed did not encourage specific discussion on each document.

That said, this court finds affirmatively that count 27 of the Superseding Indictment is prima facie evidence regarding a crime of conspiracy to obstruct justice for purposes of applying the crime-fraud exception. As noted by Magistrate Judge Gorence, for the crime-fraud exception to apply there must be prima facie evidence regarding the charge, and prima facie evidence generally means probable cause to believe that a crime has been attempted or committed and that the communications at issue were in furtherance of the crime. As an indictment must be based on probable cause, *Park Manor, Ltd. v. U.S. Dep't of Health & Human Servs.*, 495 F.3d 433, 437 (7th Cir. 2007), the government has established that the crime-fraud exception may apply to some communications. *See United States v. Kerik*, 531 F. Supp. 2d 610, 617 (S.D.N.Y. 2008). Defendants Balsiger and Currey concede that the Superseding Indictment constitutes a prima facie showing for purposes of this privilege dispute. (Doc. 201 at 9.)

However, "[a]lthough an indictment may provide probable cause to believe that the crime charged was committed, an indictment, standing alone, does not provide probable cause to believe that [an individual's] communications with [his] lawyers were in furtherance of the conduct charged in the Indictment." *United States v. Stewart*, No. 03 CR 717 (MGC), 2003 WL 23024461, *2 (S.D.N.Y. Dec. 29, 2003). Communications about past wrongdoing are not discoverable; only communications in furtherance of ongoing or future criminal conduct lose protection. *See* 1 Restatement of the Law Third on the Law Governing Lawyers sec 82 cmt. 3 ("The crime-fraud exception depends on a distinction

8

between past client wrongs and acts that are continuing or will occur in the future. The exception does not apply to communications about client criminal or fraudulent acts that occurred in the past. Communications about past acts are necessary in defending against charges concerning such conduct . . . .").)

As charged in the Superseding Indictment, Balsiger, Lance Furr, Currey, and other conspirators knowingly caused others to provide materially false information to federal law enforcement officers conducting a grand jury investigation into IOS's coupon-invoicing and accounting practices. (Doc. 131, ¶ 52.) Balsiger, Lance Furr, and others allegedly provided materially false information to recipients of grand jury subpoenas, intending that the information would be presented to the grand jury. (*Id.*) Balsiger, Lance Furr, Currey and others allegedly attempted to persuade individuals to provide false information if interviewed by law enforcement. (*Id.*) Balsiger, Lance Furr, and others attempted to prevent IOS employees from communicating with federal authorities by conditioning severance benefits on agreements not to speak and by suing or threatening suit against employees who cooperated with the grand jury investigation. (*Id.*) And Balsiger, Lance Furr, and others attempted to conceal and destroy records to prevent their discovery by law enforcement. (*Id.*) According to the Superseding Indictment, these acts occurred from March 2003 through October 2007. (*Id.*, ¶ 50.)

To the extent that any of the documents still at issue are communications in furtherance of the conspiracy charged in count 27, the crime-fraud exception applies. Nevertheless, as noted by Magistrate Judge Gorence, the privilege remains if the court finds the individual's explanation satisfactory. (Doc. 472 at 20.)

9

The court has not found in the record any explanations by the defendants to rebut the crime-fraud exception. As application of the crime-fraud exception has not been identified previously by the court regarding each document to which it applies, defendants might be excused from this fault. Providing an explanation as to each of more than two thousand documents would have been unwieldy. However, the government's objections concerned about 325 documents, and the government raised the crime-fraud exception document by document in its objections. The defendants did not reply by providing a sufficient explanation. Thus, if the crime-fraud exception applies to a particular document, the court assumes no sufficient explanation exists and the documents must be disclosed.

A final note about the crime-fraud exception: the government's arguments about the exception paint too large a swath. An example is the Juarez tour discussed below in the Steven Furr documents section. That the tour may have been used by one or more defendants to plant the seeds of or provide information on the store-tag defense does not mean that all communications about the tour lose their protection. Only the communications about that defense—not communications about other concerns or observations by the attorneys—would lose their protection.

E.    Individual Versus Corporate Privilege

    1.    The Test for Assessing Whether Privilege is Individual or Corporate

Next, the United States contends that the magistrate judge erred as a matter of law regarding the standard for whether Balsiger maintains a personal privilege in communications with attorneys who also represented IOS.

IOS waived all attorney-client privilege and work-product protection for its documents. The company's law firms, Greenberg Traurig and Scott Hulse, waived any

10

work product protection in their work for IOS. Of course, limited liability companies must act through their officers and employees. *See Upjohn*, 449 U.S. at 389-90. Balsiger, the former Chief Executive Officer of IOS, corresponded with Greenberg Traurig and Scott Hulse often regarding the government's investigation. He contends that he maintains a personal privilege regarding certain documents involving his communications with the company's law firms because the firms, especially the Scott Hulse firm, represented him individually in addition to representing IOS.

The United States contends that Magistrate Judge Gorence should have used the test set forth *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1986), to determine whether defendant Balsiger's claims of privilege as to certain documents withstand the waiver of privilege by IOS. In *Bevill*, the Third Circuit approved the following test for a corporate officer to claim a personal attorney-client privilege in communications with corporate counsel:

> "First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company."

805 F.2d at 123 (alterations in original) (quoting *In re Grand Jury Investigation, No. 83-30557*, 575 F. Supp. 777, 780 (N.D. Ga. 1983)). The First, Second, Ninth, and Tenth Circuits have adopted the *Bevill* test. *United States v. Graf*, 610 F.3d 1148, 1161 (9th Cir. 2010); *In re Grand Jury Subpoena (Newparent)*, 274 F.3d 563, 571-72 (1st Cir. 2001); *In*

11

*re Grand Jury Proceedings*, 156 F.3d 1038, 1040-41 (10th Cir. 1998); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 215-16 (2d Cir. 1997). In addition, although the Sixth Circuit has not adopted all of *Bevill*, it has agreed that the second *Bevill* factor is required, stating that it, "like many others, requires that the individual officer seeking a personal privilege '*clearly* claim[]' he is seeking legal advice in his individual capacity." *Ross v. City of Memphis*, 423 F.3d 596, 605 (6th Cir. 2005) (alteration in original) (quoting *In re Grand Jury Proceedings, Detroit, Michigan, August 1977*, 570 F.2d 562, 563 (6th Cir. 1978)).

Magistrate Judge Gorence noted the *Bevill* test but remarked that the Seventh Circuit had not adopted it. Instead, she looked to *United States v. Keplinger*, 776 F.2d 678 (7th Cir. 1985), for guidance on assessing whether a corporate official's communications with corporate attorneys were made on behalf of the individual (and so potentially protected) or on behalf of the corporation (and so waived). In *Keplinger*, which predated *Bevill*, the Seventh Circuit rejected the argument that "'an individual's mere subjective belief that he is represented . . . will always be sufficient to demonstrate that such a relationship existed for the purpose of the attorney client privilege.'" *Keplinger*, 776 F.2d at 701. The court continued: "[I]n the absence of any relatively clear indication by the potential client to the attorney that he believed he was being . . . represented, we think no . . . attorney-client relationship can be inferred without some finding that the potential client's subjective belief is minimally reasonable." *Keplinger*, 776 F.2d at 701.

In her short analysis of *Keplinger*'s application to this case, Magistrate Judge Gorence noted Balsiger's contention that he had a subjective belief that the attorneys of the Scott Hulse law firm were his personal attorneys and then found, in two sentences

12

without explanation or citation to evidence in the record, that Balsiger's belief was "minimally reasonable." (*Id.* at 18.) Magistrate Judge Gorence was not wrong in refraining from using the *Bevill* test. As she discussed, it has not been adopted by the Seventh Circuit. Moreover, the test is stricter than that described in *Keplinger*, requiring clarity and precognition that may not be possible or within the individual's control. For instance, under *Bevill* the individual when approaching corporate counsel must make it "clear" that he is seeking individual advice, when the individual and attorney's prior interactions or history may make an express, clear statement unnecessary. Also, the individual's privilege under *Bevill* rests on the attorney's responsibility for thinking through conflict issues. *Keplinger* does not demand such a rigorous test.

That said, Magistrate Judge Gorence's test is not strong enough. She referenced minimal reasonability without describing what such minimal reasonability requires and how it differs from mere subjective belief.

The *Keplinger* court discussed language in *Westinghouse Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978), that the scope of the attorney-client relationship depends on (1) the client's belief that he is consulting an attorney in a personal capacity, and (2) "his manifested intention to seek professional legal advice" in an individual capacity. 776 F.2d at 701; *see also United States v. Evans*, 113 F.3d 1457, 1465 (7th Cir. 1997) ("'The professional relationship for purposes of the privilege for attorney-client communications hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.'") (quoting *Westinghouse Corp.*, 580 F.2d at 1319) (other internal quotation marks omitted). The

13

*Keplinger* court said it did not "quibble" with this proposition and did not find "an individual's mere subjective belief that he is represented individually" to satisfy that standard because of the need for some *manifest* intention by the individual. 776 F.2d at 701. The defendants in *Keplinger* presented insufficient evidence that they "either sought legal advice on an individual basis or manifested in any way their belief that they were being represented individually." *Id.* The court then continued:

> Moreover, at least in the absence of any relatively clear indication by the potential client to the attorney that he believed he was being individually represented, we think no individual attorney-client relationship can be inferred without some finding that the potential client's subjective belief is minimally reasonable. For example, in *Westinghouse*, the attorneys had specifically represented that the information disclosed to them by the individual clients would be kept confidential.

*Id.*

The Fourth Circuit in *In re Grand Jury Subpoena: Under Seal* declined to adopt the *Bevill* test, leaving for another day the question whether *Bevill* matched the Fourth Circuit's views. 415 F.3d 333, 340 n.6 (4th Cir. 2005). Instead, similar to the *Keplinger* court, the Fourth Circuit looked for "evidence of an objectively reasonable, mutual understanding that the appellants were seeking legal advice from the investigating attorneys or that the investigating attorneys were rendering personal legal advice." *Id.* at 338. The Fourth Circuit cited to *Keplinger* for the statement that subjective belief is not enough; instead, "the putative client must show that his subjective belief that an attorney-client relationship existed was reasonable under the circumstances." *Id.* at 339. The court then held that the individuals in its case could not have reasonably believed that the corporate attorneys represented them personally because there was no evidence that the attorneys told the

14

individuals they represented them, the individuals did not ask the investigating attorneys to represent them, the individuals had never sought personal legal advice from the attorneys, the attorneys had never given them personal legal advice, and the attorneys told the individuals that the information they discussed could be disclosed at the company's discretion. *Id.*

This court reads *Keplinger*, *Westinghouse* and *Evans*, in light of this Fourth Circuit decision and the several courts' adoption of *Bevill*, to require some manifest, outward evidence—in addition to any subjective belief of the individual—to establish a "minimally"—meaning "objectively"—reasonable belief of the personal nature of the legal representation. As suggested by the *Keplinger* and *In re Grand Jury Subpoena: Under Seal* courts, such evidence could be the individual's statements or requests in seeking legal advice, some other outward expression by the individual or attorney of an understanding that representation is on a personal basis or is confidential personally, or that the subject matter clearly covers a personal legal matter.

In other words, under Seventh Circuit law as set forth in *Keplinger*, elements one through three of the *Bevill* test are not separately required. But though they do not all have to be present, some objective evidence supporting the subjective belief certainly must be. Thus, to claim personal attorney-client privilege regarding communications with Scott Hulse attorneys who represented the company too, the defendants here must present objective evidence that reasonably supports their current attestations about their intent.

The fourth *Bevill* factor is required, of course. That factor adds nothing new to the general requirements that the attorney-client privilege is waived if a communication is not

15

made in confidence.  *See United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007); *Evans*, 113 F.3d at 1461.

Further, this court is persuaded that a version of the fifth *Bevill* factor is required. "The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption."  *In re Grand Jury Subpoena*, 274 F.3d at 571.  Because of that burden, if ambiguity exists regarding whether the representation provided by an attorney was personal or on behalf of the company, or if communication with an attorney is an intertwined combination of corporate and personal representation, the communication will be deemed corporate and the documents at issue must be disclosed based on IOS's waiver.  *See In re Grand Jury Subpoena:  Under Seal*, 415 F.3d at 33.  As stated by the First Circuit, an individual privilege exists "only to the extent that communications made in a corporate officer's personal capacity are separable from those made in his corporate capacity."  *In re Grand Jury Subpoena*, 274 F.3d at 568.  "Dual" communications in which the personal and corporate capacities of the individual cannot be distinguished are not jointly privileged for the individual as well as the corporation.  *Id.* at 572; *see id.* at 573 ("Roe or Moe may only assert an individual privilege to the extent that communications regarding individual acts and liabilities are segregable from discussions about the corporation.").  The Tenth Circuit similarly found that the fifth prong of *Bevill* did not preclude an individual privilege to the extent a communication was specifically focused on individual matters.  However, the individual privilege did not exist when the communication

16

involved both corporate and individual liability. *See In re Grand Jury Proceedings*, 156 F.3d at 1042-42.

Further, based on this case law, especially that regarding element five of the *Bevill* test, the privilege must be assessed as to each communication. *See In re Grand Jury Subpoena*, 274 F.3d at 572 ("[T]heoretically, Lawyer could have represented Roe and Moe individually with respect to the grand jury investigation. Still, this attorney-client relationship would extend only to those communications which involved Roe's and Moe's individual rights and responsibilities . . . ."). Whether or not an individual may be "able to show the existence of a personal attorney-client relationship with corporate counsel, he still ha[s] the burden in this case of showing that the privilege actually applies to *the documents at issue*." *In re Grand Jury Proceedings*, 156 F.3d at 1042. No blanket privilege exists merely because an attorney or firm worked on personal matters previous to the communications at issue. For instance, in *Graf*, an attorney represented Graf personally before becoming corporate general counsel and after his general counsel position ended. However, the court found that no evidence existed that the attorney represented Graf personally while general counsel of the company. Thus, communications during the time the attorney was general counsel were not individually privileged. *See* 610 F.3d at 1163 (regarding attorney Agnello). Further, no blanket privilege exists even if an attorney worked on personal and corporate matters during the same period of time. The court must be persuaded that the specific documents at issue involved communications on the personal matters. *See In re Grand Jury Proceedings*, 156 F.3d at 1042.

Of note, while ambiguous or intertwined communications by Balsiger or Currey to the corporate attorneys are presumed to be corporate, the same does not apply to communications to their personal defense attorneys. The court has treated Balsiger's and Currey's communications with their personal defense attorneys as privileged even if the communications concern conduct based on their corporate roles. Of course the defendants' personal defense in this case will relate in some way to their corporate roles and conduct while at IOS. Thus, communications involving Balsiger's or Currey's personal defense attorneys differ from those involving only attorneys at Scott Hulse or Greenberg Traurig.

2.     Application of the Law in this Case

Magistrate Judge Gorence found that "Balsiger and Currey sufficiently established that Thomas C. Balsiger subjectively believed that the Scott Hulse law firm was his personal law firm and that such a belief was 'minimally reasonable.'" She found, as a result, that the documents in privilege log 5, titled "IOS Case Master Database" or "IOS Case Master Database Summation Iblaze," were privileged unless made in the presence of a third party outside the joint defense group. (Doc. 472 at 18-19.)

Applying the law described above, Magistrate Judge Gorence's holding was clearly erroneous because whether the Scott Hulse law firm was Balsiger's personal law firm in addition to IOS's law firm is not dispositive. The particular *communications* at issue must concern personal representation. No blanket privilege exists for all documents because Scott Hulse did some work for Balsiger personally. The privilege must be considered on a document-by-document basis.

18

Moreover, Magistrate Judge Gorence did not reference any evidence supporting her finding that Balsiger's subjective belief was minimally reasonable, and defendants have not pointed the court to such evidence. This court continues to question where the objective, manifest evidence exists showing that the various communications Balsiger claims privileged were personal rather than corporate. The court understands that some of the Scott Hulse attorneys were Balsiger's personal attorneys, too. (*See* Doc. 201 Ex. 9.) Nevertheless, if the attorneys represented the company also, Balsiger must provide manifest, objective evidence of his personal intent regarding each communication.

Further application of this law to the documents in this case is discussed below.

F.    Other Comments

In other respects, Magistrate Judge Gorence discussed the law regarding privilege matters in this case thoroughly, and there is no need to repeat it. However, the court reiterates that privileges are applied narrowly and strictly because they impede the search for the truth. *In re Grand Jury Proceedings*, 220 F.3d 568, 570 (7th Cir. 2000). The party seeking to establish the privilege bears the burden of demonstrating that all requirements for invoking it are met. *Id.*

Further, the court expressly agrees with Magistrate Judge Gorence's analysis and conclusion regarding waiver of the joint defense privilege: a party is entitled to waive protection for its or his own communications even if made in a joint-defense context, but cannot waive any privilege as to communications of another member of the joint defense. (*See* Decision and Order of 5/11/11 at 8-16.) "[T]he existence of a joint defense agreement does not increase the number of parties whose consent is needed to waive the attorney-client privilege; it merely prevents disclosure of a communication made in the

19

course of preparing a joint defense by the third party to whom it was made." *In re Grand Jury Subpoena*, 274 F.3d at 572-73. Thus, IOS (or another person) can waive its communication even if made in a joint defense context or released to joint defense counsel, but not if the communication would reveal directly or indirectly the communications of one still claiming the privilege. And Balsiger and Currey cannot stop IOS (or another person) from waiving its privilege as to its own communications simply because the communication was shared with them or their counsel as part of the joint defense.

## SPECIFIC CLAIMS OF PRIVILEGE

A.     Remaining Privilege Claims of Steven and Lance Furr

For Steven and Lance Furr, five documents remain at issue. For the following reasons, this court affirms Magistrate Judge Gorence's decision finding those documents privileged.

1.     Bates 114210-114215 (Greenberg Traurig Documents)
       SH-EDOC0010427-31; SH-EDOC0010432-35 (Scott Hulse Documents)
       (Gov't Obj'ns at 61, 68)

These documents are three copies of the same "Timeline" with variations. One version is simply the Timeline; another has attachments; the third includes an email cover page and no attachments.

According to the Furrs' Updated Privilege Log filed April 15, 2010, and the Furr–Revised Scott Hulse Electronic Docs Privilege Log (Ex. 9[3] Docs. 9250863_3,

---

[3]To place the submitted disks and external hard drives in the record the court has given them exhibit numbers and identified them on the Exhibit List at docket number 541. As these disks and external hard drives contain the in camera documents, they will all be kept under seal and located in either Judge Gorence's or this court's chambers or the clerk's sealed exhibits files.

9250864_2), Lance Furr claims the attorney-client and the work product privileges for the documents. The Timeline is described as having been created in early 2006 at the direction of counsel for Lance Furr and IOS for discussion with joint defense counsel regarding allegations concerning IOS accounting. (*See id.*) According to the privilege log, the authors were "IOS personnel." However, in their brief responding to the appeal of Magistrate Judge Gorence's decision, the Furrs clarify that the document was created by Lance Furr and William Babler at the direction of counsel.

As the document was prepared by Furr at the direction of his counsel after the investigation by the government became known to Lance Furr, this court sees no clear error in the decision that the document qualifies as attorney-client privileged material and work product. It appears to be a communication by Furr for his attorney and joint defense attorneys, in connection with legal services and in the context of the attorney-client relationship. Also, it is a document prepared for the attorney in anticipation of or for litigation. A notation on the Timeline indicates that the drafters intended the document to be privileged, suggesting that there was no intent to disclose the document to third parties.

The log indicates that the recipients were various joint defense counsel, which, under the joint defense doctrine, would not cause waiver of the privilege. The joint defense team appears to have begun in September 2005 and Lance Furr does not appear to have withdrawn by early 2006. Further, the email cover page at SH-EDOC0010427 indicates that the document was also reviewed by "PWC," which would not cause waiver, either. The court assumes "PWC" means Price Waterhouse Cooper, an accounting firm hired by Greenberg Traurig on IOS's behalf to assist with IOS legal matters. Because IOS was part of a joint defense team with Lance Furr and Babler in early 2006 the joint defense rule

21

means that the document's privileges were not waived. IOS cannot waive the privilege as to this document because it consists of communications by Lance Furr.

The United States contends that any timeline on IOS's accounting issues must contain historical facts that presumably were disclosed to the United States or other third-parties—such as during the debriefs of Lance Furr and Babler. Moreover, says the United States, the topic of this document is listed as accounting issues, so disclosure of the historical facts would not reveal additional information about what counsel was thinking; counsel knew that "the accrual" and accounting issues were relevant to the government's investigation.

However, the court is not persuaded that the contents of the document were disclosed during debriefing of Lance Furr or Babler. Moreover, work-product protection would still apply. As the document was prepared at the request of counsel, it reflects issues of concern to (and therefore mental impressions and conclusions of) counsel. Although "accounting issues" may have been a known concern of the attorneys, the Timeline is not merely a listing of dates and events. Instead, it contains more detailed information, suggesting the facts relating to accounting issues the attorneys were focusing on.

The court does not see rejection of the crime-fraud exception to be in error. The document does not appear to be in furtherance of any alleged ongoing crime or fraud. Instead, the document concerns past conduct. Thus, the court affirms the decision that this document is privileged.

2.  Exhibit H Tab 27 (Documents 153-154)
    (Gov't Obj'ns at 63)

Lance Furr claims the attorney-client and work product privileges over portions of this document. (Ex. 9 Doc. Furr–REDACTED Furr Defendants GT Privilege Log.) Attachment A to the email cover sheet document was prepared by IOS agent James McGuire as part of the joint defense effort at a meeting including counsel for Furr and IOS. Through redactions, Lance Furr has conceded that statements of William Babler and questions posed by other persons to Babler are not protected.

The United States does not dispute that parts of this Attachment A may be privileged. Instead, it disputes the scope of the redactions, contending that any historical facts and the Timeline on accounting issues were disclosed to third parties. Plus, says the United States, it has debriefed Lance Furr on those accounting issues so that the historical information can no longer be considered confidential.

This court has reviewed the document and sees no clear error by Magistrate Judge Gorence as to attorney-client and work product privileges. The redacted portions of the document reflect only discussions by Furr and his attorney and the questions by others that would reveal Furr's statements. What Furr and his attorney said and how they said it as part of the joint defense agreement are covered by attorney-client protection. The court is unpersuaded that the contents of this discussion were disclosed to parties outside the joint defense agreement. Further, as the document appears to have been related to the government's investigation and in anticipation of further government proceedings, the document qualifies for work product protection regarding what Furr and his counsel said. Regardless of whether particular "historical facts" may be within the government's

23

knowledge, what Furr and his counsel focused on and the issues they discussed concerning those historical facts are not subject to disclosure to the government.

The court sees no evidence that Attachment A is subject to the crime-fraud exception regarding ongoing fraud.  Discussion of past conduct does not trigger the crime-fraud exception.  Attachment B is privileged for the same reasons discussed above in subsection A.1.

The contents of these documents are privileged, with one caveat.  The documents reflect that they came from the email or computer of a Jennifer Nagle.  The court has looked, without success, for reference to Nagle in the record.  Assuming Nagle is affiliated with the law office of one of the joint defense attorneys the privilege applies.  If she is a third party, the privilege has been waived.  The parties should advise the court in writing if there is any dispute as to whether disclosure to Nagle waived the privilege.

3.      Exhibit I Tabs 30 and 31 (Documents 143-144, 145-146)
        (Gov't Obj'ns at 64)

These two documents are identical copies of an email and its attachment.  Lance Furr claims the attorney-client and work product privileges over the documents.  (Ex. 9 Doc. Furr–REDACTED Furr Defendants GT Privilege Log.)  This court has reviewed the documents and finds no clear error by Magistrate Judge Gorence under either doctrine.  Even under a de novo review these documents are privileged.  The contents of the attachment are classic attorney work product and communication produced by Lance Furr's attorney, Corey Rubenstein.

The United States contends that the title of the document, "Disclosure Outline," indicates that the information was intended by the Furrs and IOS to be disclosed to others

and cannot be privileged. Further, says the government, to the extent that the documents contain false information, anything other than core attorney work product would fall within the crime-fraud exception.

After reading the documents, the court is persuaded that the subject of "Disclosure Outline" is not properly interpreted to reflect an intent on the part of Furr or his attorney to disclose this particular email or its attachment. Although some of the facts mentioned in the attachment may have been disclosed to a third party, what Furr's attorney said about those facts involves counsel's mental impressions. The documents communicate counsel's thoughts and proposed strategies. Moreover, the crime-fraud exception does not apply as the documents support the magistrate judge's conclusion that the author, Rubenstein, was not furthering an ongoing fraud.

The contents of these documents are privileged, with the same caveat as discussed above. They reflect that they came from the email or computer of Jennifer Nagle. Assuming Nagle is affiliated with the law office of one of the joint defense attorneys the privilege applies. If she is a third party, the privilege has been waived. Hence, the defendants and the government should advise the court in writing if there is any dispute as to whether disclosure to Nagle waived the privilege.

4.    Exhibit I Tab 43 (Documents 48-49)
      (Gov't Obj'ns at 65)

Steven Furr claims attorney-client and work-product protection for these documents (Ex. 9 Doc. Furr–REDACTED Furr Defendants GT Privilege Log), consisting of an email and memorandum attachment. The United States objects to the claims because it believes the memorandum restates communications of IOS employees to the attorneys during a

Juarez plant tour. According to the government, any privilege as to the IOS employees' statements was waived by IOS. In addition, says the government, the crime-fraud exception should apply, making the document discoverable.

This memo does not concern statements made by the client, Steven Furr, to his attorney. Instead, the memo concerns statements made by James Currey, on behalf of IOS, to Steve Furr's attorney, as part of the joint defense effort. Although statements by IOS employees to joint defense counsel would fall within IOS's privilege waiver of the attorney-client privilege, the memo attached to the email is not merely a transcription or restatement of IOS employee statements. Instead, it is a summary of notes by Sarah Streicker, Steve Furr's attorney, about what she saw and heard. The memo was written for the file and for another attorney representing Steve Furr and seems to have been based on Streicker's impressions and what she found important. Regardless of whether unprivileged matters were mentioned by IOS employees, how Streicker understood those matters and what she chose to explain to other counsel deserve protection. Therefore, the memo qualifies as work product—work product generated for Steve Furr's defense and claimable by Steve Furr and his attorney. Because the memo was written by Streicker for the file and another of Steve Furr's attorneys, then forwarded to counsel for other defendants under joint defense principles, its protected status has not been waived. Also protected is the cover email communication between the attorneys for the joint defense defendants. Additionally, this court sees no clear error in Magistrate Judge Gorence's determination that the crime-fraud exception does not apply to this email and memo. The United States contends that information given to Steven Furr's counsel during the Juarez plant tour was designed to lay the groundwork for the "store tag defense," through which

26

defendants sought to mislead their attorneys and the United States and obstruct justice. The government bears the burden of establishing that the crime-fraud exception applies.

It is the court's view that the memo goes beyond what the government describes as the store tag defense; several topics related to the plant tour are discussed in the document. Moreover, even if the tour was intended by certain IOS employees to lay groundwork for the store tag defense, the memo is based on counsel's recollections and understandings from the plant tour. Nothing suggests that counsel's understandings expressed in this memo were to be passed to the government to advance fraud by IOS employees.[4] Therefore, Magistrate Judge Gorence's decision as to this document stands.

On the other hand, the caveat discussed in the subsection above applies. The documents reflect that they came from the email or computer of Jennifer Nagle. If Nagle is affiliated with the law office of one of the joint defense attorneys the privilege applies; if she is a third party, the privilege has been waived. The parties should advise the court in writing if there is a dispute as to whether disclosure to Nagle waived the privilege.

5.    Exhibit I Tab 44 (Documents 50-51)
      (Gov't Obj'ns at 67)

Steven Furr claims attorney-client and work-product protection for these documents, consisting of an email and memorandum attachment. (Ex. 9 Doc. Furr–REDACTED Furr Defendants GT Privilege Log.) While acknowledging that these documents may contain attorney work product, the United States contends that the parts of the memorandum

---

[4]As Steven Furr was not charged in count twenty-seven, there is no prima facie showing that he was using his attorneys to engage in fraud. Any obstructive conduct related to the tour Streicker discusses would have been that of Currey trying to use Streicker and the other attorneys. The government has not persuaded this court that attempted use of Steven Furr's attorney *by Currey* to commit a fraud would invalidate Steven Furr's claim of work product privilege.

setting forth historical, nonprivileged corporate information should have been disclosed through a redacted document.

It is easy to affirm Magistrate Judge Gorence's ruling respecting this document. The cover email is a privileged communication between joint defense counsel during the term of the joint defense agreement. Streicker's attached memorandum is protected by the attorney-client privilege and the work-product doctrine. Streicker's comments in the memorandum indicate that the document was not a summary of Steven Furr's statements and instead were her observations, impressions, and legal analysis.

The caveat noted above applies to these documents. The documents reflect that they came from the email or computer of Jennifer Nagle. If Nagle is affiliated with the law office of one of the joint defense attorneys the privilege applies; if she is a third party, the privilege has been waived. Again, the parties should advise the court in writing if there is a dispute as to whether disclosure to Nagle waived the privilege

B.     Remaining Privilege Claims of Balsiger and Currey

The court's findings as to each of the contested documents remaining from the Balsiger-Currey defendants' privilege logs are on Exhibit A, which is incorporated into this decision. Although it may be self-explanatory, in the table "AC" means attorney-client privilege, "WP" means work-product privilege, "JD" means joint defense, and "CF" means crime-fraud exception.

It is noted that some delay in issuing this decision resulted from the difficulty for this court to piece together arguments and submissions to the magistrate judge. For instance, this court had to review the record to understand what the terms "store tag defense" and "accrual" meant for application of the crime-fraud exception. Moreover, the record is

28

voluminous (the docket now contains over 500 documents) and the parties cross-referenced documents that together total hundreds of pages.

Also confusing is the changing identification of documents—sometimes documents are referenced by Bates numbers, sometimes by tab and exhibit numbers, sometimes by document numbers. The many iterations of the privilege logs, using different numbering systems (at various times by exhibit letters on government briefs, log numbers, titles such as "IOS Case Master Database Summation Iblaze"), complicated tracking of the parties' arguments regarding a particular privilege claim through prior filings—or even figuring out which version of the privilege logs to examine.

Also time consuming was the method of presentation of the Balsiger-Currey defendants' documents to the court. The same or substantially similar documents appear ten or twelve times in different parts of the logs and binders. Because the logs seem to have been created based on whose file was at issue, an email between several attorneys, such as David Bernard, Kevin Finger, and Abigail Clapp, is located in the files of each. Replies and forwarded messages often include the original email. Moreover, documents attached to emails appear on their own and in the logs of the emails—sometimes many times over.

Some identification of duplicate documents submitted on appeal should have been made.[5] It was frustrating to see a James McGuire report concerning his interviews with Babler or Perry a second time and then to search the first report to compare the documents. By about the tenth time that these documents appeared the frustration level

---

[5]The Furr defendants appear to have done this with their timeline, which apparently comes from the Greenberg Traurig and Scott Hulse files.

increased tremendously. But at least those documents were identified easily as duplicates by the court. In the future, if documents need to be reviewed in camera in this case, the party submitting the documents must present each document at issue *once and only once* even if it appears in multiple logs.

Even more concerning is that the Balsiger-Currey defendants *altered their claims of privilege on appeal*. For instance, on the log "Privilege Documents at Scott Hulse" (Doc. 450 Ex. 1) filed August 31, 2010, in what appears to be the last set of privilege logs submitted to Magistrate Judge Gorence, Balsiger and Currey claimed only work product privilege for document 2 (SH-C 000007-000009). However, the log on the CD provided to this court on December 5, 2011, reflects that Balsiger and Currey claim work product *and* attorney-client privilege. But for footnote 2 in the government's reply brief (Doc. 489 at 2 n.2), this court might not have caught the alteration.[6]

The defendants can not change their privilege claims on appeal after Magistrate Judge Gorence's ruling—especially without prominent mention of it. Because of this suspicious change, the court cross-referenced entries on the appellate logs against the prior logs. But shortly after starting this cross-referencing process, the court determined that it was just too time consuming. Instead, the court simply used the logs submitted to Magistrate Judge Gorence in August 2010 (Doc. 450) and the hard copies of the documents or the links on the disk submitted in December 2011 (Ex. 11). **If this court**

---

[6]It appears that the privilege logs on Exhibit 11 (the disk received December 5, 2011), which contain the links to the in camera documents, were not provided to the government but appear only on the sealed disk.

sees such a change of arguments or claims on appeal again in this case, the conduct will be sanctioned.

As for the Balsiger-Currey defendants, it is notable that at times they claim "joint defense" or "joint defense privilege." (*See, e.g.*, Doc. 450 Ex. 1 Doc. 73, Ex. 7 Doc. 3.)  No such independent privilege exists.  The joint defense doctrine is simply an exception to the otherwise-applicable rules of waiver when a third-party is present. *See BDO Seidman*, 492 F.3d at 815 ("Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person."); *Evans*, 113 F.3d at 1467 (quoting a Second Circuit case stating that the "joint defense privilege" is an extension of the attorney-client privilege).  Because references to the joint defense doctrine usually apply in the context of attorney-client privilege disclosures, the court assumes that wherever "joint defense" is claimed without more the defendants mean "attorney-client privilege" that has been shared in the joint defense context.  The court will not review those documents for work-product protection as well, as that protection is not mentioned.

On some logs, the Balsiger-Currey defendants use the vague term "joint defense material" as the basis for their privilege.  Again, no independent joint defense basis for privilege exists.  Other entries reference "joint defense work product" or "joint defense communication."  Reading these claims of privilege together, and adding some of the information in other columns (for instance, the "description" column on Log 8), it appears that "joint defense communication" references attorney-client privilege, and "joint defense material" references attorney-client privilege and work product.  However, this court's

31

failure to attribute such claims of privilege correctly will not be a basis for reconsideration. Balsiger and Currey are responsible for their own vague references to "joint defense material."

Also, the court found scant evidence regarding several issues, such as who joined the joint defense group and when. The Furr defendants reference a list of members as "Attachment 1" to Document 391.[7] Balsiger and Curry provide a separate list in one of their briefs (Doc. 201 at 19-21) and discuss certain members in their brief on appeal (Doc. 485). However, the defendants have not highlighted what these lists and tables are based on or submitted any hard evidence regarding them.

When addressing the magistrate judge's rulings respecting Balsiger's claims of individual privilege in communications with corporate attorneys, this court was unable to discern from the documents evidence that Balsiger was conversing with his attorneys on his own behalf rather than as an officer of IOS. There was no showing that Balsiger was receiving counsel individually rather than on behalf of IOS as to each communication.

Defendants provide a letter from the Scott Hulse firm:

> According to our records, we first began representation of Thomas C. Balsiger in March of 1990. We have provided individual legal representation to him, or to Mr. Balsiger and his wife Christy, since that date in connection with numerous personal matters, including individual estate planning and matters involving their individual holdings. We have also represented Mr. Balsiger and/or entities in which Mr. Balsiger owns an interest in various transactions since the early 1990's, primarily in connection with the formation of entities and/or acquisition of real property by such entities.

---

[7]However, no Attachment 1 was attached to Document 391 in CM/ECF. A hard-copy document called "Attachment 1" was found with the parties' in camera documents delivered by Magistrate Judge Gorence to this chambers but the court could not find where it existed in CM/ECF. The parties should determine whether Attachment 1 is properly in the record.

We have also provided services to International Outsourcing Services and its predecessor companies, NAFTA Industries, Ltd. and/or NA Data Processors, Ltd. since the early 1990's.

We have never represented Mr. Balsiger individually in connection with the Eastern District of Wisconsin investigation or the indictment of Mr. Balsiger, pending in the Eastern District of Wisconsin. Shortly after IOS' receipt of a target letter on August 10, 2005, it is our understanding that Mr. Balsiger retained Dan Reidy of Chicago as his individual defense counsel, and that he is now represented in the pending criminal matter by [Joseph Abraham]. All legal services that Scott & Hulse rendered in connection with the Eastern District of Wisconsin investigation and the subsequent indictments were rendered to IOS as corporate counsel for IOS, and not to any of the individual targets or current individual defendants.

(Doc. 201 Ex. 9; Doc. 203 Ex. 9.)

This letter provides some clarity but leaves open issues as well. The Scott Hulse firm represented Balsiger individually and as the owner of his various entities, including IOS, "since the early 1990's." So it is possible that notes from Scott Hulse attorneys relate to individual matters; however, each transaction must be examined separately. As for the criminal case before this court, the letter indicates that any services rendered by Scott Hulse after approximately August 10, 2005, regarding the government's investigation or indictment were on behalf of IOS alone. Moreover, the firm indicates that it "never" represented Balsiger individually regarding "the Eastern District of Wisconsin investigation." But the firm's view of the scope of the investigation and its time frame prior to August 2005 remains unclear.

A review of documents in this record and publicly filed documents in another case provides support for finding that "the Eastern District of Wisconsin investigation" was in progress for several years before August 2005. The Balsiger-Currey defendants wrote in one of their briefs that IOS and Balsiger "came under criminal investigation in 2003, long before the August 10, 2005 target letter." (Doc. 201 at 23.) Robert MacDonald, a sales

33

manager at IOS's Memphis office, was indicted in this district on March 4, 2003, *see United States v. Jebara*, No. 03-CR-46, indictment (filed Mar. 4, 2003), and some of the in camera documents refer to MacDonald, Jebara, Assistant United States Attorney Stephen Ingraham (one of the prosecutors on the MacDonald case and this case), and the Milwaukee office of the Federal Bureau of Investigation. The criminal complaint in the *Jebara* case includes an affidavit seeking a search warrant for three IOS offices, among other places, and MacDonald's plea agreement confirms that IOS's offices were searched. *United States v. Jebara*, No. 03-CR-46, criminal complaint aff. at 5 (filed Feb. 23, 2003), MacDonald plea agreement at 4 (filed Aug. 26, 2004). Hence, it is apparent that the indictment in this case is related to an ongoing investigation in this district during and after the *Jebara* case. Yet, the Scott Hulse firm wrote it "never" represented Balsiger individually regarding the investigation by law enforcement personnel from this district.

Based on the standard of minimal reasonability adopted by this court and the Scott Hulse firm's letter quoted above, in instances where the content of a document viewed in camera plainly indicates that it concerns a criminal investigation in the Eastern District of Wisconsin, the court has overturned Magistrate Judge Gorence's ruling. Similarly, where the content of a document indicates that Balsiger was acting as an officer of IOS rather than as an individual, the court has overturned Magistrate Judge Gorence's ruling.

Also, where the content *suggests* that Balsiger was acting as an officer or Currey was acting as an agent of IOS but their role in the communication is somewhat unclear, Magistrate Judge Gorence's rulings are reversed. Balsiger and Currey have had several opportunities over several years to point to evidence in the record that meets the standard

34

set forth above—objective, minimally reasonable, manifest evidence—of personal representation. That they have not done so during the years the privilege issue has been litigated means the documents must be preserved unprivileged.

Finally, in the attached table certain rulings apply only if a specific person other than Balsiger or Currey has also claimed the privilege. (*See, e.g.*, Ex. A at Log 2 Doc. 8.) The court did not pour over documents reviewed by Magistrate Judge Gorence that are not at issue in this appeal to see if the Furr defendants, for instance, claimed privilege over an identical document. The specific defendant referenced is instructed to check on the status of each of such documents referencing him to determine whether he claimed privilege and whether the claim was challenged by the government or upheld by Magistrate Judge Gorence. Any disputes between the defendant referenced and the government as to whether the documents are the same as those claimed by Balsiger-Currey should be submitted to Magistrate Judge Gorence.

CONCLUSION

As described above and in Exhibit A,

IT IS ORDERED that Magistrate Judge Gorence's Decision and Order dated May 11, 2011, (Doc. 472) is affirmed in part and reversed in part.

Dated at Milwaukee, Wisconsin, this 10th day of July, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE

35